**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTINI E RICCI IAMINO S.P.A. – CONSORTILE SOCIETA AGRICOLA, an Italian Company , | CASE NO. 1:13-CV-0097 AWI BAM |
| Plaintiffs | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | (Doc. No. 24) |
| WESTERN FRESH MARKETING SERVICES, INC., a California Corporation, and DOES 1-20, | |
| Defendant | |

This case stems from the provision of kiwi fruit from Plaintiff Martini E Ricci Iamino S.P.A. ("M&R") to Western Fresh Marketing Services, Inc. ("Western"). The active complaint is the First Amended Complaint ("FAC"). M&R alleges five causes of action against Western in the FAC: (1) breach of contract under the United Nations Convention for the International Sale of Goods ("CISG");[1] (2) breach of written contract; (3) price of goods; (4) account stated; and (5) open book account. Western now moves for summary judgment. For the reasons that follow, Western's motion will be granted.

---

[1] The CISG has been reprinted at 15 U.S.C. App'x (1998).

1

## FACTUAL BACKGROUND[2]

2      Western has been in continuous existence since 1994 and is a year-round supplier of

3  imported and domestic fruit.  DUMF 1.  M&R is an agricultural consortium located in Italy, that is

4  engaged in producing and shipping kiwi fruit for sale in North America and other parts of the

5  world.  See DUMF 5; PUMF 24.  Andrea Martini ("Martini") is the Vice-President of M&R.  See

6  PUMF 25.  Gary Raden ("Raden") is the owner and individual manager of RadenGrp, LLC

7  ("RadenGrp"), a limited liability company with its principal place of business in Big Sky,

8  Montana.  DUMF 2.  RadenGrp has been in continual existence since 1971 and serves as a sales

9  agent in North America for fruit and wine producers in Europe and North Africa.  Id.  RadenGrp

10  works in conjunction with a partner agent in Europe, Stefano De Nadai ("De Nadai), to solicit

11  product from producers and shippers, and to negotiate sales of the product to North American

12  customers.  See DUMF 4.  Martini worked with De Nadai on a regular basis, and De Nadai was

13  aware of the general terms under which M&R sold kiwis, including the prices M&R expected for

14  various sizes and quantities of kiwi.  See PUMF 26.  De Nadai is not an employee of M&R, rather

15  De Nadai and Raden are independent sales people.  See Martini Dec. ¶ 3.

16      De Nadai would inform Raden about the M&R kiwis available and the terms under which

17  M&R would be willing to sell and ship them.  See id. In late 2008, Western was contacted by

18  Raden with a proposal for Western to market and sell M&R's kiwi fruit during the 2008-2009

19  kiwi fruit season.  DUMF 6.  RadenGrp negotiated a deal with Western to sell M&R's kiwi fruit in

20  the United States during the 2008-2009 season.  DUMF 7.  RadenGrp negotiated the deal and

21  acted on behalf of M&R.  See Raden Dec. ¶¶ 5, 14; DUMF 5.[3]  Western paid no fees to Raden or

22  De Nadai in connection with the 2008-2009 M&R kiwis, nor was Western ever asked to do so.

23  _____

[2] "DUMF" refers to Defendant's Undisputed Material Fact; "PUMF" refers to Plaintiff's Undisputed Material Fact.

24

[3] M&R disputes DUMF 5 by stating Raden and RadenGrp were not "agents" of M&R, but instead acted as

25  independent sales people.  As indicated above, Martini has declared that De Nadai is not an employee of M&R, and
De Nadai and Raden are independent sales people.  See Martini Dec. ¶ 3.  Paragraph 3 does not actually deny that De

26  Nadia and RadenGrp acted on behalf of M&R.  Further, Raden has declared that RadenGrp acted as M&R's agents,
and Western's president has declared without contradiction that Western paid no fees to Raden or De Nadai, was not

27  asked to pay fees, but it is his understanding that M&R paid Raden and De Nadai fees.  See Kragie Dec. ¶ 9; Raden
Dec. ¶¶ 5, 14.  An individual may be both an agent and an independent contractor.  Park v. Burlington N. Santa Fe

28  Railway Co., 108 Cal.App.4th 595, 613 n.14 (2003).  Without more from M&R regarding the relationship between
Raden/RadenGrp/De Nadia, DUMF 5 is undisputed.

1    See Kragie Dec. ¶ 9.  Raden communicated directly with Western employees concerning the

2    M&R kiwis, and De Nadai would then communicate the orders to Martini in the form of an e-mail

3    outlining the terms of the proposed sale.  See Martini Dec. ¶ 3; Kragie Dec. ¶ 5.

4           Under the agreement, M&R agreed to pay Western an 8% sales commission and reimburse

5    Western for all of its sales expenses.  DUMF 10.[4]  Western agreed to collect the sales proceeds

6    from its customers, deduct its commissions and expenses, accurately account for all sales and

7    deductions, and remit the net proceeds to M&R.  DUMF 11.[5]  None of the shipments of kiwi fruit

8    were purchased by Western from M&R, nor did Western offer to purchase any of the shipments.

9    DUMF 13.[6]

10          George Kragie ("Kragie"), Western's president, described the agreement as follows:

11          [M&R] and [Western] reached a deal wherein [Western] agreed to receive and sell
            [M&R]'s kiwi fruit on an open consignment basis.  [Western] retained full
12          authority to set the sales prices of the kiwi fruit based on the kind and quality of the
            shipments received and the market conditions existing at the time.
13

14          The agreement did not call for [Western] to market and sell [M&R]'s kiwi fruit at
            fixed or agreed prices, nor did [Western] agree to remit specific net sales returns to
            [M&R].  In fact, had [M&R] insisted that [Western] remit specific net sales returns,
15          [Western] would not have entered into the agreement to market and sell [M&R's]
            fruit.
16          . . . .

17          [Western] agreed to collect the sales proceeds from its customers, deduct
            commissions and expenses, accurately account for all sales and deductions, and
18          remit the net proceeds to [M&R].

19   Kragie Dec. ¶¶ 6-7, 10.  This is consistent with Raden, who described the M&R/Western

20   agreement in pertinent part as follows:

21          . . . [Western] agreed to receive and sell [M&R]'s kiwi fruit on an open
            consignment basis, meaning that [Western] had full authority to set the sales prices
22          of the kiwi fruit based on the kind and quality of the shipments received and the
            market conditions existing at the time.  None of the shipments of kiwi fruit were
23

24   [4] M&R disputes DUMF 10 by stating that Western was to obtain a minimum price regardless of commission.
     However, this does not actually dispute that M&R agreed to give Western a commission.  DUMF 10 is undisputed.
25
     [5] M&R disputes DUMF 11 by stating that Western was to obtain a minimum price regardless of commission.  Like the
26   response to DUMF 10, M&R's response does not actually dispute the substance of DUMF 11.  DUMF 11 is
     undisputed.
27
     [6] M&R disputes DUMF 13 by stating that Western was to obtain a minimum prices for the kiwi on the market.
28   However, this does not dispute the substance of the DUMF.  In fact, by stating that Western was to obtain prices on
     the market, M&R is actually conceding that Western did not agree to purchase the kiwis.  DUMF 13 is undisputed.

required to be sold by [Western] at fixed or agreed upon prices, nor was there an expectation under the agreement that [Western] would remit specific net sales returns to [M&R].
. . . .

[Western] had a duty to collect the sales proceeds from its customers, deduct all expenses, accurately account for all sales and expenses, and remit the net proceeds to [M&R].
. . . .

Each of the 10 containers was shipped to [Western] on an open consignment basis; none of the shipments of kiwi fruit were direct sales to [Western].

Raden Dec. ¶¶ 6, 8, 10.  Further, in an e-mail to Kragie, De Nadai stated "I was personally in charge to transmit and confirm orders to packers, so I can confirm that on all my written confirmations to [M&R], it was clearly stated that shiments [sic] were intended on an open consignment basis to [Western], as to some other receivers."  Western Ex. 000034.  In contrast, however, Martini has declared that:  "[M&R] shipped kiwi to [Western] during the 2008-2009 [season] pursuant to an understanding that [Western] would obtain a minimum price as indicated in order e-mails . . .  and reiterated in invoices . . . . "  Martini Dec. ¶ 4.

For each of the 10 shipment orders, an e-mail was sent from De Nadai to Martini, and Raden was a "cc" recipient.  See Raden Dec. Ex. 1; M&R Exs. A to J.  Each of the 10 e-mails has a section that lists a number of pallets for different sizes of kiwis, and a number in United States dollars.  See id.  Martini declares that the dollar figure is the minimum price per box.  See, e.g., Martini Dec. ¶¶ 10, 11; see also PUMF 27.  Each of the 10 e-mails also expressly states "open consignment."  See Raden Dec. Ex. 1.

Pursuant to the agreement, M&R shipped 10 ocean containers of kiwi fruit to Western. Raden Dec. ¶ 9.  Each of the shipments included a pro forma invoice, which is an invoice required by the United States Customs and Border Protection Agency for examination, classification, and appraisal of imported goods.  See DUMF 20.  With the exception of Order 75, the pro forma invoices have a U.S. dollar figure that corresponds to the per box U.S. dollar figure in the e-mails from De Nadai to Martini.  Cf. Raden Ex. 1 with M&R Exs. 000007, 000020, 000034, 000049, 000064, 000081, 000096, 000109, 000125, and 000142.

According to Kragie, the shipments received at Western's warehouse were of inferior quality, with extensive hail and sunburn damage, as well as "shrivel."  See Kragie Dec. ¶ 13.

4

1   Some of the shipments appeared to have been packed so that good quality fruit was on the top

2   layers and poor quality fruit was on the bottom layers.  See Kragie Dec. ¶ 15.  Western was

3   required to repack such fruit in order to make it marketable to customers.  See id.  Some of the

4   fruit that was delivered to Western's customers was rejected.  See id. at ¶ 16.  Five of the

5   shipments (Order Nos. 23, 45, 46, 66, and 77) received a U.S. No. 1 grade and did not fail the

6   United Sates Department of Agriculture ("USDA") inspection.  See Martini Dec. ¶¶ 8, 16, 20, 24,

7   32.  The remaining five shipments (Order Nos. 24, 75, 78, 83, and 84) failed to meet the minimum

8   standards for importation of kiwi fruit into the United States.  DUMF 16.  Western was forced to

9   cull a substantial amount of kiwi fruit, repack the shipments, and have them reinspected by the

10  USDA in order to meet U.S. No. 1 grade standards.  Id.  In particular, the following boxes were

11  dumped from the following orders:  347 boxes from Order 24; 776 boxes from Order 75; 207

12  boxes from Order 78; 460 boxes from Order 83; and 834 boxes from Order 84.  See Western Ex.

13  Bates Nos. 000012, 000014, 000016, 000018, 000020.  As M&R's agents, RadenGrp and De

14  Nadai kept M&R informed of the quality issues and market conditions throughout the kiwi fruit

15  season and thereafter.  See Raden Dec. ¶ 14; DUMF 18.[7]

16         Western properly marketed and sold M&R's kiwi fruit, accounted to M&R, and remitted

17  net proceeds of approximately $150,000.00.  See DUMF 19.  However, the prices obtained

18  generally were lower than the prices listed on M&R's invoices.  Cf. Raden Dec. Ex. 1 with

19  Western Exs. Bates Nos. 00001 to 000010.[8]  In mid to late 2009, Martini expressed his concerns to

20  Raden about the returns M&R was receiving from Western.  See Martini Dec. ¶ 45.

21         Around July 2009, M&R made a claim against its credit insurer, Coface, for amounts that

22  M&R believed were due and unpaid by Western.  See id. at ¶ 46; Kragie Dec. ¶ 21.  Kragie

23  personally responded to Coface and advised that Western had received 10 shipments of kiwi from

24  ───────────────

25  [7] M&R disputes DUMF 18 by citing to Paragraphs 45 and 46 of Martini's declaration.  However, those two
    paragraphs deal with Martini's concerns over the returns received from Western, and M&R making a claim with its
    credit insurer for the amounts M&R believed was owed to it by Western.  See Martini Dec. ¶¶ 45-46.  Paragraphs 45
26  and 46 do not deal in any way with communications from RadenGrp or De Nadai relating to quality issues and market
    conditions.  Paragraphs 45 and 46 do not create a genuine dispute.  Cf. Raden Dec. ¶ 14 with Martini Dec. ¶¶ 45, 46.

27  [8] The Court notes that in some instances, Western obtained a higher price than that listed on the e-mails and invoices.
    For example, Western obtained a higher per box price for the kiwis of Order No. 78, and for the 39' kiwis of Order
28  No. 23.  Cf. Raden Ex. 1 with Western Exs. 00001 to 000010.

5

1    M&R on an open consignment, had marketed and sold the kiwis, had properly accounted, and had

2    remitted net proceeds of nearly $150,000 to M&R.  See Kragie Dec. ¶ 22.  Western provided "lot

3    summaries" to Coface in order to justify the amounts paid to M&R.  See Martini Dec. ¶ 46.

4    Western also provided Certificates of Inspection from the USDA and warehouse condition reports

5    that documented the quality issues with the M&R shipments.[9]  See Raden Dec. ¶ 13.

6         M&R contends that Western owes it approximately $192,000 for the kiwis.  See FAC ¶ 21.

7    Kragie and Raden have both declared that Western properly marketed and sold the kiwis,

8    accounted for handling of all loads, remitted the net returns to Martini, and that there are no

9    further amounts owed to M&R.  See Kragie Dec. ¶ 28; Raden Dec. ¶ 16.

10

11                          **SUMMARY JUDGMENT FRAMEWORK**

12        Summary judgment is proper when it is demonstrated that there exists no genuine issue as

13   to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

14   Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

15   Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

16   the initial burden of informing the court of the basis for its motion and of identifying the portions

17   of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

18   issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty

19   Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

20   of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

21   (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

22   a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

23   moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d

24   509, 514 (9th Cir. 2010).

25        Where the moving party will have the burden of proof on an issue at trial, the movant must

26   affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

27   _____

28   [9] It is unclear when and to whom these reports were provided.  Raden's declaration suggests that Western provided
     these documents after Martini expressed his dissatisfaction with Western's returns.  See Raden Dec. ¶¶ 12-13.

1   Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

2   issue at trial, the movant may prevail by presenting evidence that negates an essential element of

3   the non-moving party's claim or by merely pointing out that there is an absence of evidence to

4   support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

5   Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

6   fails to carry its burden of production, then "the non-moving party has no obligation to produce

7   anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

8   Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

9   meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

10  issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

11  Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

12  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

13  forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

14  Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

15      The opposing party's evidence is to be believed, and all justifiable inferences that may be

16  drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

17  Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

18  (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

19  inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

20  899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly

21  D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the

22  air, and it is the opposing party's obligation to produce a factual predicate from which the

23  inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

24  2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

25  issue of material fact does not spring into being simply because a litigant claims that one exists or

26  promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

27  15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

28  2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is

1 'merely colorable' or 'is not significantly probative.'" <u>Anderson</u>, 477 U.S. at 249-50; <u>Hardage v.</u>

2 <u>CBS Broad. Inc.</u>, 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce

3 evidence sufficient to create a genuine issue of material fact, the moving party is entitled to

4 summary judgment.  <u>Nissan Fire</u>, 210 F.3d at 1103.

5

6 **DEFENDANT'S MOTION**

7 <u>**1.    First Cause of Action – CISG Breach of Contract**</u>

8 *Parties' Arguments*

9 Western argues *inter alia* that the CISG applies to the sale of goods.  The transaction in

10 this case is a consignment, and a consignment is not a sale.  Because the transaction is not a sale,

11 the CISG does not apply.

12 M&R argues *inter alia* that the CISG is intended to promote uniformity in international

13 trade.  Because the transactions between M&R and Western are certainly matters of international

14 trade, and application of the CISG to this case would promote uniformity of expectations, the

15 CISG applies to this transaction.

16 *Discussion*

17 The FAC alleges that that agreement for the 10 shipments of M&R kiwis was a direct sale

18 between M&R and Western.  <u>See</u> FAC ¶ 11.  Nevertheless, the evidence clearly shows that the

19 agreement was a consignment.  Both Kragie and Raden expressly declare that the agreement was

20 that of an open consignment, and that the agreement was not for the direct sale of kiwis from

21 M&R to Western.  <u>See</u> Kragie Dec. ¶¶ 6-8, 11; Raden Dec. ¶¶ 6, 10.  The e-mails from De Nadai

22 to Martini expressly state that each of the 10 kiwi shipments were "open consignments," and De

23 Nadai's e-mail to Kragie confirms the shipments were "open consignments."  <u>See</u> Raden Dec. Ex.

24 1; Western Ex. 000034.  Although Martini's declaration maintains that there was a minimum price

25 expectation, that does not change the nature of the agreement.  True consignments "create an

26 agency pursuant to which goods are delivered to a dealer for the purpose of resale . . . "  <u>Glenshaw</u>

27 <u>Glass Co. v. Ontario Grape Growers' Mktg. Bd.</u>, 67 F.3d 470, 475 (3d Cir. 1995).  The consignor

28 "usually," not always "requires the consignee to charge a certain price for the goods."  <u>Id.</u>  The

8

1  Court concludes that the agreement between M&R and Western was a consignment agreement.

2      That the agreement was a consignment is dispositve.  "The CISG is an international treaty

3  that governs the formation of international sales contracts as well as the rights and obligations of

4  the parties."  Genpharm Inc. v. Pliva-Lachema A.S., 361 F.Supp.2d 49, 53-54 (E.D. N.Y. 2005).

5  The CISG applies to "contracts of sale of goods between parties whose places of business are in

6  different States . . . when the States are Contracting States."  BP Oil Int'l, Ltd. v. Empresa Estatal

7  Petroleos de Ecuador, 332 F.3d 333, 336 (5th Cir. 2003); Chateau Des Charmes Wines LTD. v.

8  Sabate USA Inc., 328 F.3d 528, 530 (9th Cir. 2003).  However, "[i]n ordinary commercial

9  practice, a consignment is nothing more than a bailment for care or sale, wherein there is no

10  obligation of purchase in the consignee."  In re D. I. A. Sales Corp., 339 F.2d 175, 178 (6th Cir.

11  1964).  "A consignment of goods for sale does not pass the title at any time, nor does it

12  contemplate that it should be passed."  Christopher v. SmithKline Beecham Corp., 132 S. Ct.

13  2156, 2169 (2012).  That is, "a true consignment does not effect a sale . . . ."  In re Ide Jewelry

14  Co., 75 B.R. 969, 976 (Bankr. S.D. N.Y. 1987);[10] see also Taylor v. Wachtler, 825 F.Supp. 95,

15  103 (E.D. Pa. 1993); Jackson v. Dep't of Justice, 85 Cal.App.4th 1334, 1350 (2001).  This Court

16  has examined the issue of whether the CISG applies to consignment transactions.  Relying on the

17  nature of a consignment, the language of the CISG, the structure and provisions of the Uniform

18  Commercial Code art. 2, and the policies underlying the CISG, this Court recently concluded that

19  the CISG does not apply to true consignments.  See Martini E Ricci Iamino S.P.A – Consortile

20  Sociate Agricola v. Trinity Fruit Sales, 2014 U.S. Dist. LEXIS 90604, *31-*42 (E.D. Cal. July 2,

21  2014).  M&R has made no arguments that would cause the Court to reconsider this conclusion.

22      In sum, the agreement between M&R and Western was a consignment agreement.

23  Because the CISG does not apply to consignments, the CISG has no application to this case.  See

24  id.  Therefore, summary judgment in favor of Western on the first cause of action is appropriate.

25  See id.

26

---

27  [10] The Court notes that the Ninth Circuit has cited with approval *In re Ide Jewelry*'s discussion of, and distinction
between, "true consignments" and "security interests."  See United States v. Lawson, 925 F.2d 1207, 1211 (9th Cir.

28  1991).

1          **2.      Second Cause of Action – Breach of Written Contract**

2          *Defendant's Argument*

3          Western argues that the agreement between M&R and Western was an oral agreement.

4   Although M&R relies on the pro forma invoices it sent with each shipment of kiwis, invoices do

5   not represent a contract between the parties.  The statute of limitations for an oral contract in

6   California is two years.  M&R alleges that the agreements were breached in early 2009, but M&R

7   did not file suit until January 2013.  M&R did not assert its rights until nearly two years after the

8   limitations period had expired.  M&R's breach of contract cause of action is time-barred.

9          Additionally, the FAC alleges that the agreement at issue was a direct sale agreement.

10  M&R is bound by its assertions in the FAC.  However, there is no evidence of any agreement for

11  the direct sale of kiwis from M&R to Western.

12         *Plaintiff's Opposition*

13         M&R argues that there is a four year statute of limitations under California law that applies

14  to written contracts.  The writings that constitute the contracts in this case are the order e-mails

15  and the invoices sent to Western.  Raden declared that the e-mails confirmed the terms of the

16  orders he negotiated with Western, and the e-mails confirm a minimum agreed price.  Further, the

17  terms of the agreement were reduced to writing in the form of the invoices.  There need only be a

18  writing containing all terms and acceptance of the writing by the party to be charged.  Western did

19  not object to the invoices, and Raden declares that the e-mails confirmed the agreements struck

20  with Western.  Western's silence and Raden's declaration are sufficient to demonstrate Western's

21  consent to the minimum prices.  The e-mails and the invoices list a price per box, and it would be

22  unreasonable for a trier of fact to assume that the price listed in either the e-mails or the invoices

23  or both had no meaning.

24         *Discussion*

25         a.      Consequences Of The FAC

26         "Factual assertions in pleadings and pretrial orders, unless amended, are considered

27  judicial admissions conclusively binding on the party who made them." American Title Ins. Co.

28  v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988); see also El Paso Natural Gas Co. v. United

1   States, 750 F.3d 863 (D.C. Cir. 2014).  In pertinent part, the FAC alleges that M&R agreed to

2   produce and deliver kiwis to Western in exchange for prompt payment of the invoiced amounts,

3   and that each of the "sale transactions [between M&R and Western] represented a direct sale by

4   [M&R] to Western for the stated amount."  FAC ¶¶ 32, 33.  These allegations reflect a claim based

5   on a specific contract between M&R and Western for a direct sale of kiwis by M&R to Western

6   for an agreed upon price.  See id.  There is no mention of any of the transactions being

7   consignments.  See id. at ¶¶ 32-40.

8        M&R is bound by the allegation that the contract at issue is a contract for the direct sale of

9   kiwis to Western for a fixed price.  See American Title, 861 F.2d at 226; Martini E Ricci, 2014

10  U.S. Dist. LEXIS 990604 at *42-*44.  However, as discussed above, the transactions at issue are

11  consignments, and consignments are not direct sales from the consignor to the consignee.  See

12  Christopher, 132 S. Ct. at 2169; In re D. I. A., 339 F.2d at 178; Taylor, 825 F.Supp. at 103-04; In

13  re Ide Jewelry Co., 75 B.R. at 976; Jackson, 85 Cal.App.4th at 1350.  There are different

14  obligations involved depending on whether a transaction is a sale or a consignment.  Under a

15  consignment, the consignee is obligated to sell the consignor's goods at either an agreed upon

16  price or the best price possible, and then remit the net proceeds to the consignor.  See Christopher,

17  132 S. Ct. at 2169; In re D. I. A., 339 F.2d at 178; Taylor, 825 F.Supp. at 103-04; Davidson Fruit

18  Co. v. Produce Distributors Co., 134 P. 510, 511 (Wash. 1913); Raden Dec. ¶ 6.  Under an

19  agreement for sale, "one party turns goods over to another and that second party sells them as his

20  own and is liable to the first party only for the purchase price."  Taylor, 852 F.Supp. at 103-04; see

21  also Kemp-Booth Co. v. Calvin, 84 F.2d 377, 381 (9th Cir. 1936).  Courts have found that

22  characterizing an agreement as a consignment may be a defense to a claim for a breach of a sale

23  agreement.  E.g. Taylor, 825 F.Supp. at 103; Davidson Fruit, 134 P. at 511; J.C. Merrill & Co. v.

24  A. Jaeger, 5 Haw. 475 (Haw. 1885).  Here, there is simply no evidence before the Court that

25  Western agreed to directly purchase any kiwis from M&R.  In fact, the evidence is expressly to the

26  contrary.  See Kragie Dec. ¶¶ 6, 11; Raden Dec. ¶¶ 10, 16.  Therefore, the contract described

27  under the second cause of action does not exist.

28       Because no direct sale occurred in this case, summary judgment is appropriate.

1
     b.     Statute Of Limitations

2
     Alternatively, M&R has not established that the 4-year limitations period applies in this

3 case.  The 4-year limitations period applies to contracts "founded upon an instrument in writing . .

4 . ." Cal. Civ. Code § 337.  For oral contracts, the statute of limitations is 2-years.  See Cal. Civ.

5 Code § 339.  In order for a contract to be "founded on a writing," the writing must contain the

6 relevant terms of the agreement and the defendant must have "accepted" the writing.  See Amen v.

7 Merced County Title Co., 58 Cal.2d 528, 532 (1962); Pietrobon v. Libarle, 137 Cal.App.4th 992,

8 997 (2006); E.O.C. Ord, Inc. v. Kovakovich, 200 Cal. App. 3d 1194, 1201 (1988).  A defendant's

9 acceptance may be proven in various ways, including by evidence of words spoken, evidence of a

10 particular act other than signing, or evidence that the party to be charged prepared the written

11 document and offered to perform its terms.  E.O.C. Ord, 200 Cal.App.3d at 1201.  Also, the

12 prevailing rule is that an invoice, standing alone, is not a contract, and a buyer is ordinarily not

13 bound by statements on the invoice which are not a part of the original agreement.  Hebberd-

14 Kulow Enterprises, Inc. v. Kelomar, Inc., 218 Cal.App.4th 272, 283 (2013); C9 Ventures v. SVC-

15 West, L.P., 202 Cal.App.4th 1483, 1501-02 (2012); India Paint Co. v. United Steel Prod. Corp.,

16 123 Cal.App.2d 597, 607 (1954).  Here, M&R states that the writings that form the written

17 contract are the e-mails and the invoices.

18
     With respect to e-mails, those e-mails are from De Nadai to Martini, with Raden as a "cc"

19 recipient.  See Raden Dec. Ex. 1.  There is no evidence that these e-mails ever went to Western,

20 nor is there evidence that De Nadai was acting as an agent on behalf of Western when he sent the

21 e-mails.  In fact, the only evidence before the Court is that De Nadai had worked with M&R in the

22 past, M&R paid De Nadai, De Nadai was working on behalf of M&R, and Western did not pay De

23 Nadai.  It is true that Raden referred to the e-mails from De Nadai as order confirmations.  See

24 Raden Dec. ¶ 10.  However, Raden did not state that there was a minimum price expectation,

25 rather, he declared expressly that the agreement was an open consignment without any fixed or

26 agreed prices.  See id. at ¶ 6.  M&R is stretching Raden's declaration too far.  Moreover, even if

27 the Court found M&R's interpretation of Raden's declaration persuasive, M&R has submitted no

28 evidence that supports attributing Raden's words to Western.  Like De Nadai, there is no evidence

1  that Raden has ever acted as an agent or otherwise acted on behalf of Western in any matters

2  concerning M&R.  There is insufficient evidence to support a finding that De Nadai's e-mails

3  constitute a "writing" between M&R and Western.

4       As for the invoices, there are problems.  First, M&R does not address the general rule that

5  invoices are insufficient to constitute a contract.  See India Paint, 123 Cal.App.2d at 607.  In the

6  absence of additional evidence or argument, all that is before the Court are Italian language

7  invoices (the entire content of which are unclear), not contracts.  See id.  Second, there is no

8  evidence that Western "accepted" the alleged minimum prices in the invoices.  Although M&R

9  states that Western never voiced objections to the prices or invoices, no evidence is cited in

10  support of that assertion.  See Bryant, 289 F.3d at 1167.  Instead, Kragie's declaration states in

11  part that he informed Coface that the funds had been accounted for and remitted to M&R.  See

12  Kragie Dec. ¶ 22.  This indicates that Western did not agree that additional sum were owed, and

13  thus a rejection of at least the final invoices.  Further, it is undisputed that the *pro forma* invoices

14  were a requirement of the U.S. Customs agency.  See DUMF 20.  Given the purpose of the *pro*

15  *forma* invoices, it is not at all clear that Western viewed the *pro forma* invoices as anything other

16  than a necessary administrative step, as opposed to a memorialization of agreed upon terms.

17  Moreover, because Western understood the agreement to be an open consignment without fixed

18  prices, Western did not anticipate paying any invoiced amounts.  See Kragie Dec. ¶¶ 6, 7, 19.

19  That is, Kragie's declaration shows that Western did not accept the invoiced amounts as due and

20  owed to M&R.  Finally, although Martini declares that all the invoices reflected the agreed upon

21  minimum price, that contradicts the declaration of Raden and is inconsistent with an e-mail from

22  De Nadai.  Raden declared that the agreement was for an open consignment without fixed or

23  agreed upon prices, and De Nadai wrote that the agreement was an open consignment.  See Raden

24  Dec. ¶ 6; Western Ex. 000034.  M&R never explains what is meant by the term "open

25  consignment," but Raden's understanding of the term is the same as Kragie's understanding, and it

26  was Raden/RadenGrp that negotiated with Western.  See Kragie Dec. ¶¶ 5-7; Raden Dec. ¶¶ 5, 6.

27  Raden/RadenGrp/De Nadai acted on behalf of M&R in forming the agreement, and Raden's

28  declaration and De Nadai's e-mail are contrary to the meaning that M&R wishes to ascribe to the

1   invoices.  "When an agent contracts in the name of his principal, the principal contracts and is

2   bound . . . ."  Goldwater v. Oltman, 210 Cal. 408, 427 (1930).  M&R does not explain why it

3   should not be bound by Raden's representation and understanding of the agreement.

4        In sum, M&R has not presented sufficient evidence of a writing that was accepted by

5   Western.  Without such a writing, the 2-year statute of limitations for oral agreements apply to this

6   case.  See Cal. Civ. Code § 339.  Because this lawsuit was filed in 2013, and there is no dispute

7   that M&R's contract claim accrued in 2009, M&R's breach of contract claim is untimely.  See id.

8   Summary judgment on this cause of action is appropriate.

9        **3.    Third Cause of Action – Price of Goods**

10       M&R's third cause of action is brought under California Commercial Code § 2703(e).

11  California Commercial Code § 2703(e) reads in part:  "Where the buyer wrongfully rejects or

12  revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates

13  with respect to a part or the whole, then with respect to any goods directly affected . . . the

14  aggrieved seller may: . . . (e) Recover damages for nonacceptance (Section 2708) or in a proper

15  case the price (Section 2709)."  However, like the second cause of action, this claim is based on

16  allegations that the provision of kiwis by M&R to Western were direct sales to Western.  See FAC

17  ¶ 43.  In other words, this claim is based on a direct sale contract, not a consignment contract.  For

18  the same reasons discussed under the second cause of action regarding the consequences of the

19  FAC's allegations, summary judgment in favor of Western on this cause of action is appropriate.

20       **4.    Fourth Cause of Action – Account Stated**

21  *Parties' Arguments*

22       Western argues that the FAC contains only conclusory statements that a promise to pay

23  was implied when Western failed to object to the amounts owing.  There are no facts alleged that

24  support an implied promise, no could there be.  M&R's agent in the transaction, Raden,

25  contradicts any allegation that an additional balance is owed by Western.  Raden expressly

26  declared that there are no amounts due and owing by Western to M&R.  Additionally, the fourth

27  cause of action incorporates proceeding paragraphs by reference, including the allegations

28  regarding breach of contract.  However, the law is established that a debt which is predicated on

1  an express contract cannot be the basis of an account stated.  The FAC may be read as failing to

2  properly distinguish between an account stated and a breach of contract.

3      M&R does not address or defend this cause of action.

4      *Legal Standard*

5      An "account stated" is "an agreement, based on prior transactions between the parties, that

6  all items of the account are true and that the balance struck is due and owing from one party to the

7  other."  S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1091 (9th Cir. 1989); Trafton v. Youngblood,

8  69 Cal.2d 17, 25 (1968).  The elements of an account stated are: "(1) previous transactions

9  between the parties establishing the relationship of debtor and creditor; (2) an agreement between

10  the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by

11  the debtor, express or implied, to pay the amount due."  Zinn v. Fred R. Bright Co., 271 Cal.

12  App.2d 597, 600 (1969); see Maggio, 196 Cal.App.3d at 752-53.  Both parties must assent to the

13  new amount owed in order to create an account stated.  See Hansen v. Fresno Jersey Farm Dairy

14  Co., 220 Cal. 402, 408 (1934); Maggio, 196 Cal.App.3d at 752.  The agreement necessary to

15  establish an account stated need not be express and may be implied from the circumstances.  See

16  Hansen, 220 Cal. at 408; Maggio, 196 Cal.App.3d at 753.  If a statement is rendered to the debtor,

17  and the debtor does not reply in a reasonable time, the law implies an agreement that the account

18  is correct.  Maggio, 196 Cal.App.3d at 753; Zinn, 271 Cal.App.2d at 600; see also Davis v. Cox &

19  Summa Corp., 751 F.2d 1507, 1515 (9th Cir. 1985); Hansen, 220 Cal. at 408.  However, "where

20  liability had been long and persistently denied, the failure of a person to object to the correctness

21  of a statement of account sent to him does not imply a promise to pay or convert the transaction

22  into an account stated."  Cowell v. Snyder, 171 Cal. 291, 295 (1915).  "An account stated

23  constitutes a new contract which supersedes and extinguishes the original obligation."  Zinn, 271

24  Cal.App.2d at 600; see Jones v. Wilson, 10 Cal.2d 493, 498 (1938).  An "action upon an account

25  stated is not upon the original dealings and transactions of the parties," rather it is "upon the new

26  contract by and under which the parties have adjusted their differences and reached an

27  agreement."  Gardner v. Watson, 170 Cal. 570, 574 (1915); see S.O.S., 886 F.2d at 1091; Gleason

28  v. Klamer, 103 Cal.App.3d 782, 786-87 (1980).  Thus, a debt which is not predicated on a new

1    contract, but is instead based on a preexisting express contract, "cannot be the basis of an account

2    stated." National Ins. Co. v. Expert Auto. Reconditioning, Inc., 2013 U.S. Dist. LEXIS 168375,

3    *9-*10 (C.D. Cal. Nov. 24, 2013); Moore v. Bartholomae Corp., 69 Cal.App.2d 474, 477 (1945).

4           *Discussion*

5           As Western correctly points out, the FAC's fourth cause of action incorporates by

6    reference all previous allegations. See FAC ¶ 48.  Under the second cause of action, the FAC

7    alleges that Western's breach of contract caused damages of $191,650.26.  See FAC ¶ 40.  Under

8    the fourth cause of action, the FAC alleges that "an account was stated in writing by and between

9    [M&R] and [Western] and on such statement a balance of $191,650.26 was provided to [Western]

10    from [M&R]."  See FAC ¶ 49.  Paragraph 40 and 49 indicate that there is not a separate contract

11    for the disputed debt.  The indication is that M&R is attempting to utilize an account stated to

12    recover on the single express contract with Western, and not on a new and separate agreement.

13    Without a new and separate agreement regarding the new amount owed, there is not an account

14    stated.  See National Ins., 2013 U.S. Dist. LEXIS 168375 at *9-*10; Gleason, 103 Cal.App.3d at

15    786-87; Zinn, 271 Cal.App.2d at 600; Moore, 69 Cal.App.2d at 477.

16           Further, the FAC alleges that a statement was sent and that Western failed to reply.

17    However, allegations in a complaint are insufficient to defeat a summary judgment motion. Estate

18    of Tucker, 515 F.3d at 1030.  There is no evidence concerning what kind of statement was actually

19    sent to Western that invoked the $191,650.26 figure, what the statement actually said, when the

20    statement was sent, and what response, if any, was received.  Instead, the evidence shows that

21    Western denies any additional amounts are owed, Western never anticipated making any further

22    payments to M&R beyond the remitted $148,258.70, Western essentially denied to Coface in the

23    summer of 2009 that any additional amounts were owed, and that Western contacted Raden about

24    M&R's claims to Coface, to which Raden confirmed that the agreement was for an open

25    consignment, i.e. no fixed or agreed upon prices.  See Kragie Dec. ¶¶ 20-25.  The evidence

26    presented does not indicate that Western either expressly or impliedly agreed that $191,650.26

27    was the amount due to M&R.  See Hansen, 220 Cal. at 408; Cowell, 171 Cal. at 295; Maggio, 196

28    Cal.App.3d at 752-53.

1    In sum, there is insufficient evidence of Western's assent to a separate and new agreement

2  regarding any amount owed by Western to M&R.  Summary judgment in favor Western is

3  appropriate.  National Ins., 2013 U.S. Dist. LEXIS 168375 at *9-*10; Hansen, 220 Cal. at 408;

4  Maggio, 196 Cal.App.3d at 752; Zinn, 271 Cal.App.2d at 600; Moore, 69 Cal.App.2d at 477.

5    **5.    Fifth Cause of Action – Book Account**

6    *Parties' Arguments*

7    Western argues that M&R has offered no evidence of the existence of a book account, and

8  offered no adequate accounting to Western.  Moreover, there is no evidence that the parties ever

9  agreed to create or be bound by a book account.  In fact, the declarations of both Kragie and

10  Raden show that no amount is owing to M&R.

11    M&R does not address or defend this cause of action.

12    *Legal Standard*

13    A "book account" is defined by statute as:

14  a detailed statement which constitutes the principal record of one or more
    transactions between a debtor and a creditor arising out of a contract or some
15  fiduciary relation, and shows the debits and credits in connection therewith, and
    against whom and in favor of whom entries are made, is entered in the regular
16  course of business as conducted by such creditor or fiduciary, and is kept in a
    reasonably permanent form and manner and is (1) in a bound book, or (2) on a
17  sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on
    a card or cards of a permanent character, or is kept in any other reasonably
18  permanent form and manner.

19  Cal. Code Civ. Pro. § 337a.  "A book account is created by the agreement or conduct of the parties

20  in a commercial transaction."  H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola

21  Bottling Corp., 99 Cal.App.3d 711, 728 (1979); see also Maggio, Inc. v. Neal, 196 Cal.App.3d

22  745, 752 (1987).  Importantly, "moneys due under an express contract cannot be recovered in an

23  action on an 'open book account' in the absence of a contrary agreement between the parties."

24  H&C Global Supplies Sa De Cv v. Pandol Aosscs. Marketing, Inc., 2013 U.S. Dist. LEXIS

25  159185, *6-*7 (E.D. Cal. Nov. 6, 2013); Dreyer's Grand Ice Cream, Inc. v. Ice Cream Distributors

26  of Evansville, LLC, 2010 U.S. Dist. LEXIS 47738, *11 n.5 (N.D. Cal. May 14, 2010); Armstrong

27  Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal.App.4th 1375, 1396 n.9 (2004).  "[C]ourts

28  require that the parties expressly intend to be bound because accruing debts under an express

17

1   contract are not normally considered the subject of an open book account." In re Roberts Farms,

2   Inc., 980 F.2d 1248, 1252 n.3 (9th Cir. 1992).  The "mere incidental keeping of accounts does not

3   alone create a book account." Maggio, 196 Cal.App.3d at 752; H. Russell Taylor, 99 Cal.App.3d

4   at 728.

5       *Discussion*

6           In the absence of evidence or argument from M&R, the Court agrees with Western.  There

7   was clearly a consignment agreement between M&R and Western, but there is no evidence that

8   the parties ever agreed to be bound by a book account.  Without an agreement to be bound by a

9   book account, reliance on the parties' consignment agreement alone is insufficient.  See In re

10  Roberts Farms, 980 F.2d at 1252 n.3; Armstrong, 116 Cal.App.4th at 1396 n.9; H. Russell Taylor,

11  99 Cal.App.3d at 728.  Further, no documents have been produced that would fit the description of

12  a book account.  The most that is before the Court is a series of invoices, which is insufficient.

13  See Maggio, 196 Cal.App.3d at 752.  Therefore, summary judgment in favor of Western on this

14  cause of action is appropriate.

15

16                                **ORDER**

17          Accordingly, IT IS HEREBY ORDERED that:

18  1.      Defendant's motion for summary judgment is GRANTED;

19  2.      All currently pending dates and deadlines are VACATED; and

20  3.      The Clerk shall enter judgment in favor of Defendant and against Plaintiff.

21

22  IT IS SO ORDERED.

23  Dated:   September 17, 2014          _____

                                        SENIOR  DISTRICT  JUDGE

24

25

26

27

28

                                        18